

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-9-2007

# Core Comm Inc v. Verizon PA Inc

Precedential or Non-Precedential: Precedential

Docket No. 06-2419

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Core Comm Inc v. Verizon PA Inc" (2007). *2007 Decisions.* Paper 1035.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1035

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-2419

———

CORE COMMUNICATIONS, INC.,

Appellant

v.

VERIZON PENNSYLVANIA, INC.

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cv-04513)
District Judge:  Honorable Timothy J. Savage

———

Argued February 13, 2007
Before:  SMITH and FISHER, *Circuit Judges*,
and DIAMOND,[*] *District Judge*.

---

[*]The Honorable Gustave Diamond, United States District
Judge for the Western District of Pennsylvania, sitting by
designation.

(Filed May 9, 2007  )

Barry W. Krengel
Dolchin, Slotkin & Todd
2005 Market Street, 24th Floor
Philadelphia, PA  19103

Deborah J. Israel
Louis J. Rouleau
Michael B. Hazzard (Argued)
Womble, Carlyle, Sandridge & Rice
1401 Eye Street, N.W., 7th Floor
Washington, DC  20005
        *Attorneys for Appellant*

Thomas A. Leonard
Richard P. Limburg
H. David Seidman
Obermayer, Rebmann, Maxwell & Hippel
1617 John F. Kennedy Boulevard
One Penn Center, 19th Floor
Philadelphia, PA  19103

Austin C. Schlick (Argued)
Kellogg, Huber, Hansen, Todd, Evans & Figel
1615 M Street, N.W., Suite 400
Washington, DC  20036

Joseph M. Ruggiero
Verizon Communications
1515 North Courthouse Road, Suite 500
Arlington, VA  22201

Cynthia L. Randall
Verizon Communications
1717 Arch Street, 10th Floor
Philadelphia, PA  19103
        *Attorneys for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

This appeal involves the question of whether a federal district court, in the first instance, may hear disputes concerning the breach of an interconnection agreement formed and approved pursuant to the Federal Telecommunications Act of 1996, Pub. L. No. 104-404, 110 Stat. 56 (1996) ("Telecommunications Act" or "Act").  The United States District Court for the Eastern District of Pennsylvania held that the Act prevents parties from taking such claims to federal court until they have been litigated before a state commission.  Core Communications, Inc. ("Core"), argues that the District Court erred by misapplying *Chevron* deference to graft onto the Act an exhaustion requirement for enforcement actions when Congress did not provide for one.  For the reasons that follow, we will

3

affirm the judgment of the District Court dismissing Count III of Core's complaint without prejudice, vacate the dismissal of the remaining counts, and remand for further proceedings consistent with this opinion.

I.

The dispute in this case centers on the duties an incumbent provider of telecommunications services owes with respect to new entrants who wish to compete with the incumbent in a particular local market, and how those duties are enforced. Such questions are governed by the Telecommunications Act of 1996, which was enacted "to promote competition and reduce regulation in order to secure lower prices and higher quality service for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Preamble, Telecommunications Act of 1996, Pub. L. No. 104-404, 110 Stat. 56 (1996). "As the legislative history explains, the Act creates 'a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition.'" *Puerto Rico Tel. Co. v. Telecomms. Regulatory Bd.*, 189 F.3d 1, 7-8 (1st Cir. 1999) (quoting H.R. Conf. Rep. No. 104-458, at 113 (1996)).

To achieve these goals, the Act provides that various responsibilities are to be divided between the state and federal governments, making it "an exercise in what has been termed cooperative federalism." *Id.* at 8. That is, "Congress enlisted

4

the aid of state public utility commissions to ensure that local competition was implemented fairly and with due regard to the local conditions and the particular historical circumstances of local regulation under the prior regime." *Global Naps, Inc. v. Mass. Dept. of Telecomm. and Energy*, 427 F.3d 34, 46 (1st Cir. 2005) (quoting Peter W. Huber et al., *Federal Telecommunications Law* § 3.3.4 (2d ed. 1999)) (internal quotation marks omitted). The "intended effect" of such a regime was to "leav[e] state commissions free, where warranted, to reflect the policy choices made by their states." *Id.*

There are two sections of the Act that are at issue in this case: §§ 251 and 252. Section 251 requires companies that traditionally provide local phone service – known as incumbent local exchange carriers ("ILECs") – to interconnect their networks with the networks of competitors – known as competing local exchange carriers ("CLECs"). 47 U.S.C. § 251(c)(2). Specifically, the Act charges ILECs with:

> The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--
>
> (A) for the transmission and routing of telephone exchange service and exchange access;
>
> (B) at any technically feasible point within the carrier's network;

5

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

*Id.* § 251(c)(2). It also requires ILECs to lease portions of their existing networks to their competitors and to permit the "physical collocation of [CLEC] equipment necessary for interconnection or access to unbundled network elements" at the ILEC's premises. *Id.* § 251(c)(3), (6). Without these requirements, new entrants could not afford to build the large and expensive communications grids that incumbents have developed through years in the market.

To implement these new duties, the Act relies on a system of private negotiations, followed by arbitration, if necessary, both under the supervision of state commissions. All of these steps to attain an interconnection agreement may be followed by federal court review, if it is sought by the parties. The process commences when an ILEC receives a "request for interconnection" from another telecommunications company. *Id.* § 252(a)(1). The Act then requires the ILEC to "negotiate in good faith in accordance with section 252 . . . the particular terms and conditions of agreements to fulfill" its substantive duties under the Act. *Id.* § 252(c)(1). A requesting carrier may

6

also choose to adopt all of the terms and conditions of an existing state commission-approved agreement that the incumbent has with another carrier. *Id.* § 252(i).

To deal with problems that may arise during the negotiation period, the Act provides that, if the parties are unable to agree, either party may petition the state commission to arbitrate "open issues." *Id.* § 252(b)(1). As a final procedural safeguard, all interconnection agreements must be submitted to the state commission for approval. *Id.* § 252(e)(1). The commission's "determinations" with respect to the agreements are subject to review in federal court. *Id.* § 252(e)(6).

Pursuant to the Act, Core entered into an interconnection agreement with Verizon Pennsylvania, Inc.'s ("Verizon") predecessor in interest on March 31, 2000. Rather than negotiating from scratch, Core opted into the existing agreement between Verizon's predecessor (Bell Atlantic-Pennsylvania, Inc.) and MCImetro Access Transmission Services, Inc.

Between the fall of 2000 and October 2002, Core requested interconnection to various markets in Pennsylvania. Core alleges that Verizon deliberately and unjustifiably refused to interconnect with Core at technically feasible points in a timely manner. Rather than using existing facilities with spare capacity to interconnect, Verizon cited its internal policy of requiring the construction of new, dedicated facilities to interconnect with Core. No technical or business justification was given explaining the need for this requirement. Core claims that Verizon intentionally took these steps in order to maintain

7

its competitive advantage in Pennsylvania markets and to intimidate and financially harm Core.

On September 24, 2004, Core filed the complaint underlying this action in the United States District Court for the Eastern District of Pennsylvania. It alleged that Verizon's conduct violated the Telecommunications Act, as amended, including §§ 201 and 202 (Count I), and § 251 (Count II), constituted a material breach of the interconnection agreement (Count III), and was tortious under Pennsylvania's common law for intentional non-disclosure and fraudulent concealment (Count IV).

On November 4, 2004, Verizon filed a motion to dismiss, seeking the dismissal of Counts I, II, and IV for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and Count III for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). On March 21, 2006, the District Court dismissed Core's complaint in its entirety without prejudice. It reasoned that, although it had federal question and diversity jurisdiction over the action under 28 U.S.C. §§ 1331 and 1332, *Chevron* deference required that it adhere to the FCC's ruling in *In re Starpower Communications, LLC*, 15 F.C.C.R. 11277 (2000). Under that decision, the District Court concluded that § 252 of the Act imposed "an intermediate step before getting to federal court, not unlike an exhaustion of remedies requirement," with respect to interconnection agreement-related claims. *See Core Commc'ns, Inc. v. Verizon Pa., Inc.*, 423 F. Supp. 2d 493, 500 (E.D. Pa. 2006). That is, it concluded that Core must seek review by the Pennsylvania Public Utility Commission ("PA

8

PUC") of its claim that the approved interconnection agreement had been breached before resorting to the federal courts.

On April 5, 2006, Core filed a motion for reconsideration or amended judgment. Following this motion, Core and Verizon entered into a tolling agreement that tolled the statute of limitations on Core's claims until forty-five days after the entry of an order resolving or otherwise disposing of an appeal to this Court from the District Court's decision. In accordance with that agreement, Core filed a praecipe to withdraw its motion for reconsideration or amended judgment on April 19, 2006. In the wake of this agreement, Core filed a notice of appeal on April 20, 2006. On April 26, 2006, this Court issued a stay pending the District Court's disposition of Core's motion for reconsideration, which was dismissed as moot on May 3, 2006. This appeal followed.

II.

Before moving to any of the claims raised by Core, we must first determine whether or not we have jurisdiction to hear this case. Verizon argues that there is no appellate jurisdiction under 28 U.S.C. § 1291 because a district court's dismissal without prejudice is not ordinarily a final order unless the applicable statute of limitations would not permit the re-filing of the claims. Core, on the other hand, contends that we do have appellate jurisdiction because the District Court did not take an action equivalent to a stay, but rather dismissed this case from its docket. It also disputes Verizon's claim that there are no statute of limitations issues.

"A party generally may not take an appeal under § 1291 until there has been a decision by the District Court that 'ends litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Richman Bros. Records, Inc. v. U.S. Sprint Comm'ns Co.*, 953 F.2d 1431, 1441 (3d Cir. 1991) (quoting *Van Cauwenberge v. Baird*, 486 U.S. 517, 521-22 (1988)). Ordinarily, an order dismissing a complaint without prejudice is not a final order unless the applicable statute of limitations would not permit the re-filing of the claims. *Ahmed v. Dragovich*, 297 F.3d 201, 207 (3d Cir. 2002).

Under this standard, Verizon argues that because the applicable statute of limitations for each claim is tolled pursuant to an agreement of the parties, Core retains the right to re-plead its claims, and thus the District Court's order is not final under § 1291. However, Core argues that the agreement does not in fact cure prospective statute of limitations problems. Verizon agreed only to toll the applicable statutes of limitations through this appeal. Under the agreement, it appears that the statutory periods would resume running forty-five days after we enter a judgment. They would not continue to toll during the PA PUC proceeding. In addition, Verizon specifically reserved the right in the agreement to assert a limitations defense against Core based on lapses occurring after this appeal.[1]

---

[1]During oral argument, counsel for Verizon agreed that it would interpret the tolling agreement as extending through the proceedings before the PA PUC. However, we will not premise a refusal to exercise jurisdiction on the representations of one attorney when the intent of the parties is so clearly expressed in the agreement, and both parties had all of the relevant

Thus, it is far from clear that Core could simply re-plead its claims. To the contrary, it seems certain that at least some of the claims will be time barred if Core is forced to litigate its claim for breach of the interconnection agreement before the PA PUC. Count I of the complaint, for example, contains a limitations period of two years that began to run in October 2002, when Verizon failed to interconnect in Wilkes-Barre. *See* 47 U.S.C. § 415. Core filed its original complaint on September 24, 2004. It would be essentially impossible for the time lapse from the end of this appeal to the re-filing of the complaint, including time for the PA PUC to make its determination, to be less than one month. Similarly, Core's claim advanced in Count II was based on Verizon's failure to interconnect in Philadelphia in November 2000 and in Pittsburgh in May 2001. As such, there are eight months remaining in the applicable limitations period. *See* 28 U.S.C. § 1658. In this case, since "the plaintiff cannot cure the deficiency, an order dismissing a complaint without prejudice is a final and appealable order." *Ahmed*, 297 F.3d at 207 (citing *Newark Branch, NAACP v. Harrison, N.J.*, 907 F.2d 1408, 1416 (3d Cir. 1990)). Because the statutes of limitations controlling the claims that Core was not instructed to present to the PA PUC will certainly limit its ability to re-file, we will treat that order as final for the purpose of this appeal.

III.

---

information before them when the agreement was made. That is, both Core and Verizon were aware of the possibility of a PA PUC proceeding, and chose not to toll the applicable statutes of limitations for that event.

Moving to the merits, the essence of Core's argument is that it was not required to litigate its claim for breach of the interconnection agreement in front of the PA PUC as an intermediate step before the District Court could hear the case. The District Court held, and Verizon argues, that the statutory scheme under the Telecommunications Act requires that Core first present this claim to the state commission before proceeding in a federal district court. It reached this conclusion by applying *Chevron* deference to the FCC's decision in *In re Starpower Communications*. We exercise plenary review over such claims, which implicate the District Court's conclusions of law. *See*, *e.g.*, *Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 766 (3d Cir. 1994).

Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), federal courts must defer to an implementing agency's interpretation of a statute within its jurisdiction if (1) "the statute is silent or ambiguous with respect to the specific issue" at hand, and (2) "the agency's answer is based on a permissible construction of the statute." *Id.* at 843. As the Supreme Court explained, "[a] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). The Supreme Court has emphasized that "[s]uch deference is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not

12

judicial ones,' and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 866) (internal citations omitted).

## A.

Under this framework, the first question we must answer is "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. In making this determination, the Supreme Court has instructed that "a reviewing court should not confine itself to examining a particular statutory provision in isolation." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133. Instead, we must interpret the statute "'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959)). "In addition, we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Id.*

In this case, the "precise question at issue" involves the proper procedure for the interpretation and enforcement of previously approved interconnection agreements. Specifically, we must determine whether a party may proceed directly to federal court to litigate such claims, or if it must first present them to the state commission that originally approved the

13

agreement.  We turn to the Telecommunications Act to determine whether or not Congress has spoken on this question.

The "[p]rocedures for negotiation, arbitration, and approval of [interconnection] agreements" are discussed in § 252 of the Act.  Subsection (e), titled "Approval by state commission," explains the role of state commissions like the PA PUC. It provides that "[a]ny interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission.  A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies."  47 U.S.C. § 252(e)(1).  Subsections (e)(2) through (e)(5) list the grounds for rejecting an interconnection agreement submitted to the commission, preserve state authority to establish or enforce requirements of state law in reviewing agreements, set a calendar for state commission decisions, and give the FCC authority to act if the state commission fails to carry out its responsibilities.  Finally, § 252(e)(6) describes the extent of judicial review relating to actions under § 252:

> In a case in which a State fails to act as described in paragraph (5),[2] the proceeding by the

[2]Paragraph (5) provides that

[i]f a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding

14

> Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

*Id.* § 252(e)(6). Beyond this, there is no real indication of what role the state commissions are to play, and the Act is simply silent as to the procedure for post-formation disputes.

Core, however, argues that Act provides a procedure for post-formation disputes in §§ 206 and 207. Section 206 is entitled "Carriers' liability for damages" and provides that

> [i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or

---

> or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

47 U.S.C. § 252(e)(5).

15

shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

47 U.S.C. § 206. Section 207 is the "recovery of damages" provision related to § 206. It provides that

[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

*Id.* § 207. Core argues that these two provisions allow it to bring a suit for damages against Verizon in federal court, notwithstanding any authority that may be vested with the state commissions.

However, as Verizon points out, these sections do not apply to the current dispute because it does not involve the provision of "telecommunications services." Both § 206 and § 207 apply explicitly to claims against "common carriers." When Congress amended the Act in 1996, it amended the definition of "common carrier" to provide that "[a] telecommunications carrier shall be treated as a common carrier under this chapter *only to the extent that it is engaged in providing telecommunications services*." 47 U.S.C. § 153(44) (emphasis added). According to the Act, "[t]he term 'telecommunications service' means the offering of telecommunications[3] for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." *Id.* § 153(46). We agree with Verizon that in providing – or failing to provide – interconnection, which is defined under § 251(c)(2) of the Act as "the physical linking of two networks for the mutual exchange of traffic," to another telecommunications carrier it was not providing telecommunications for a fee directly to the public.[4] *See*, *e.g.*, *Global Naps, Inc. v. Bell Atl. - N.J., Inc.*, 287

---

[3]The Act defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43).

[4]Although, as Core points out, the FCC has reached a different conclusion about whether providing interconnection services is included in the definition of telecommunications services under the Act, *see TSR Wireless, LLC v. US West*

F. Supp. 2d 532, 546-47 (D.N.J. 2003); *FTC v. Verity Int'l*, 124 F. Supp. 2d 193, 201-02 (S.D.N.Y. 2000) ("The Telecommunications Act of 1996 likewise distinguishes between telecommunications services and information services, stating that 'a telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services.'" (quoting 47 U.S.C. § 153(44))). Sections 206 and 207 are thus inapplicable to the case before us. Accordingly, given the lack of any guidance as to the proper interpretation and enforcement

---

*Communications, Inc.*, 15 F.C.C.R. 11166, 11172 (2000), we need not defer to an agency's interpretation of a statute that confers jurisdiction on the federal courts. *See Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473, 478 (D.C. Cir. 2001) ("[W]hen Congress has 'established an enforcement scheme' that gives a party 'direct recourse to federal court,' it is 'inappropriate to consult executive interpretations of [the jurisdiction-conferring statute] to resolve ambiguities surrounding the scope of [the party's] judicially enforceable remedy.'" (quoting *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 650 (1990))).

procedure in this case,[5] we conclude that Congress has not spoken on the precise question at issue here.

## B.

Faced with a gap in the relevant statutory scheme, we turn to step two of *Chevron*, which instructs that "if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 132. In this case, both the District Court and Verizon looked to the FCC's decision in *In re Starpower*

---

[5]We emphasize that our conclusion that the Act is silent on the question at issue here is based on our view of the unusual nature of the statutory scheme. Had we limited ourselves to considering portions of the statutory text in isolation, we could conclude that Congress meant its statement that "[a]ny interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission," 47 U.S.C. § 252(e)(1), to also imply the contrapositive: that state commissions do not have authority over any issue other than whether to approve or reject interconnection agreements. However, viewing the statute "as a symmetrical and coherent regulatory scheme," *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (quoting *Gustafson*, 513 U.S. at 569), we are reluctant to conclude that Congress would have preserved state authority to such an extent and then cut it off without a more explicit statement.

19

*Communications.*[6] That case involved a dispute between Starpower Communications and Bell Atlantic Virginia and GTE South about whether calls to Internet Service Providers were "local calls" under an approved interconnection agreement. *See* 15 F.C.C.R. at 11278. Starpower had asked the Virginia State Corporation Commission, the relevant state commission in that case, to issue a declaratory ruling on this point and to order GTE to pay reciprocal compensation, but the commission refused. *Id.* Starpower then asked the FCC to step in and hold that such determinations were ones that the state commission was required to make under § 252(e)(5).[7] *Id.* at 11277-78. Thus, the FCC explained that it must "determine whether a dispute arising from interconnection agreements and seeking interpretation and enforcement of those agreements is within the states' 'responsibility' under section 252." *Id.* at 11279. After posing

---

[6]Neither party in this case challenges the FCC's position as the agency charged with implementing the Telecommunications Act. *See Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 980-81 ("Congress has delegated to the Commission the authority to 'execute and enforce' the Communications Act, § 151, and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act, § 201(b)." (citing *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377-378 (1999))).

[7]Section 252(e)(5) requires the FCC to preempt the jurisdiction of a state commission in any proceeding or matter in which the state commission "fails to act to carry out its responsibility" under § 252. *See* 47 U.S.C. § 252(e)(5).

this question, the FCC provided the answer: "We conclude that it is." *Id.*

Arguing that the District Court's deference to the FCC's determination in *Starpower* was an error, Core first contends that the decision is irrelevant to the current case. Although the FCC's decision is susceptible to both narrow and broad readings, under either view it is clearly relevant to the question we must answer here. Under the narrowest interpretation, *Starpower* stands for the proposition that state commissions have, at a minimum, the non-exclusive authority to hear post-formation disputes involving approved interconnection agreements, despite the Act's silence on the issue.[8] That is,

[8]Indeed, every federal appellate court to consider the issue has determined or assumed that state commissions have the authority to hear interpretation and enforcement actions regarding approved interconnection agreements, despite the Act's silence on that point. *See P.R. Tel. Co. v. Telecomms. Regulatory Bd.*, 189 F.3d 1, 10-13 (1st Cir. 1999); *Bell Atl. Md., Inc. v. MCI WorldCom*, 240 F.3d 279, 304 (4th Cir. 2001), *vacated on other grounds in Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002); *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tx.*, 208 F.3d 475, 479-80 (5th Cir. 2000); *Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566, 573 (7th Cir. 1999); *Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 804 (8th Cir. 1997), *reversed in part on other grounds*, *Iowa Utils. Bd.*, 525 U.S. at 385; *Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000); *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1278 (11th Cir. 2003) (*en banc*).

21

because the case came to the FCC after Starpower had voluntarily attempted to litigate its claim before the Virginia commission, *id.* at 11278, the FCC's decision did not actually force a party to bring its post-formation dispute to a state commission before proceeding in federal court.

However, given the FCC's behavior and the structure of the statutory scheme as a whole, we believe that more can be drawn from the FCC's conclusion "that dispute[s] arising from interconnection agreements and seeking interpretation and enforcement of those agreements [are] within the states' 'responsibility' under section 252." *Id.* at 11279. As an initial matter, the FCC's language – calling interpretation and enforcement disputes part of the states' "responsibility" under § 252 – suggests that there is not a shared role for the federal courts in the first instance. To be fair, the FCC was echoing the language in § 252(e)(5), but in reaching its conclusion it did not rely at all on the fact that Starpower had chosen to litigate before the state commission. Rather, it concluded that such a delegation of responsibility best fit the statutory scheme created by Congress. In addition, we can find no indication in other FCC decisions that the state commissions' jurisdiction over post-formation disputes is shared with the federal courts. To the contrary, every indication is that "the FCC plainly expects state commissions to decide intermediation and enforcement disputes that arise after the approval procedures are complete." *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tx.*, 208 F.3d 475, 480 (5th Cir. 2000) (citing *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3703-04 (1999), *vacated on other grounds in Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000) (noting that parties are

22

bound by their interconnection agreements "as interpreted and enforced by the state commissions," and discussing factors state commissions should consider when "construing the parties' agreements").

In following this broader reading of *Starpower*, we are mindful of the Supreme Court's admonition that we must interpret the statute "'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (quoting *Gustafson*, 513 U.S. at 569; *Mandel Brothers, Inc.*, 359 U.S. at 389). In the context of the Telecommunications Act, we believe that a "symmetrical and coherent regulatory scheme" is one where the bodies that considered formation problems also resolve interpretation difficulties. As with formation problems, federal court jurisdiction over state commission interpretation and enforcement decisions should be limited to appellate review. *See* 47 U.S.C. § 252(e)(6) (granting district courts authority to review "determinations" made by the state commissions under § 252). As the United States Court of Appeals for the Eleventh Circuit has emphasized,

> [a] state commission's authority to approve or reject an interconnection agreement would itself be undermined if it lacked authority to determine in the first instance the meaning of an agreement that it has approved. A court might ascribe to the agreement a meaning that differs from what the state commission believed it was approving – indeed, the agreement as interpreted by the court may be one the state commission would never

23

have approved in the first place. To deprive the state commission of authority to interpret the agreement that it has approved would thus subvert the role that Congress prescribed for state commissions.

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1278 n.9 (11th Cir. 2003) (*en banc*). Indeed, as the Eleventh Circuit recognized, to allow parties to circumvent the state commissions in post-formation disputes would undermine the Act's sense of cooperative federalism, under which the states were given primary responsibility over interconnection agreements. "Rather than placing the entire scope of regulatory authority in the federal government, 'Congress enlisted the aid of state public utility commissions to ensure that local competition was implemented fairly and with due regard to the local conditions and the particular historical circumstances of local regulation under the prior regime.'" *Global Naps, Inc.*, 427 F.3d at 46 (quoting Peter W. Huber et al., *Federal Telecommunications Law* § 3.3.4 (2d ed. 1999)). The FCC's interpretation wisely recognizes this fact to fill the gap left by Congress.

Notwithstanding this analysis, Core argues that *Starpower* is not entitled to *Chevron* deference because Congress merely delegated authority to the FCC to preempt affirmative refusals by state commissions to carry out their responsibilities under § 252 of the Act, not to "mandate an 'interim step' to federal district court review." This argument misses the point. *Chevron* deference is premised on the idea that where Congress has left a gap or ambiguity in a statute

24

within an agency's jurisdiction, that agency has the power to fill in or clarify the relevant provisions. *Chevron*, 467 U.S. at 843-44. As we explained above, the Telecommunications Act is silent on the procedure for post-formation disputes. Under *Chevron*, this silence coupled with a permissible interpretation from the Act's implementing agency is all that is needed for deference. *Id.* at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). *Chevron* does not require that the Act explicitly delegate the authority to the FCC. Rather, it is the Act's silence that is the source of the delegation in this context.

Core's next argument is that *Starpower* is not owed deference because the FCC's decision was guided by two "instructive" federal appellate court cases, rather than by the agency's expertise. However, a primary source of an agency's power under *Chevron* deference is delegation, not simply expertise. By not speaking on the subject, *Chevron* instructs that Congress was implicitly delegating responsibility to the FCC to determine the procedure for post-formation disputes. *See Chevron*, 467 U.S. at 843-44. Facing the same objection in *BellSouth*, Judge Black of the United States Court of Appeals for the Eleventh Circuit explained,

> By virtue of that Congressional delegation, an administrative agency need not cite any cases in reaching its interpretation; its interpretation is authoritative because it has been posited by the agency. Of course, the agency's interpretation cannot be "procedurally defective, arbitrary or

capricious in substance, or manifestly contrary to the statute," [*United States v.*] *Mead Corp.*, 533 U.S. [218,] 227 [(2001)], and legal errors in the agency's decision might transgress these limits. Within these boundaries, however, an agency is entitled to deference simply because it has acted.

317 F.3d at 1284 (Black, J., concurring). In addition, it is not clear that the FCC was making its decision based only on the cases it cited. It also noted in its analysis that "due to its role in the approval process, a state commission is well-suited to address disputes arising from interconnection agreements." *Starpower*, 15 F.C.C.R. at 11280. Thus, the force of *Starpower* is not undermined by any reliance on federal cases.

Finally, Core invokes the United States Court of Appeals for the District of Columbia Circuit's decision in *Murphy Exploration & Production Co. v. U.S. Department of the Interior*, 252 F.3d 473 (D.C. Cir. 2001), to argue that *Starpower* is not entitled to *Chevron* deference because an agency is owed no deference when limiting federal jurisdiction. However, this argument misconstrues the holding in *Murphy*. There, the court concluded that "*Chevron* does not apply to statutes that . . . *confer* jurisdiction on the federal courts." *Id.* at 478 (emphasis added). As it explained, "when Congress has 'established an enforcement scheme' that gives a party 'direct recourse to federal court,' it is 'inappropriate to consult executive interpretations of [the jurisdiction-conferring statute] to resolve ambiguities surrounding the scope of [the party's] judicially enforceable remedy.'" *Id.* (quoting *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 650 (1990)). We are not faced with such

26

a situation in this case. The FCC in *Starpower* did not interpret a statute that conferred jurisdiction on the federal courts, but rather one that defined the procedures related to the formation of interconnection agreements, and the very reason *Chevron* deference is an issue in this case is the Act's silence regarding an enforcement scheme. Thus, we see no reason why *Chevron* deference would be inappropriate here.

Accordingly, we conclude that the FCC has offered a reasonable solution to fill a gap that currently exists in the Telecommunications Act. Pursuant to the FCC's guidance, we hold that interpretation and enforcement actions that arise after a state commission has approved an interconnection agreement must be litigated in the first instance before the relevant state commission. A party may then proceed to federal court to seek review of the commission's decision or move on to the appropriate trial court to seek damages for a breach, if the commission finds one.

C.

Having concluded that Core's claim for breach of the interconnection agreement must be presented to the PA PUC in the first instance, we now turn to the remainder of its claims. Without discussing anything other than Core's breach of contract claim, the District Court dismissed Core's entire complaint without prejudice. Given our conclusion that the relevant statutes of limitations will certainly limit Core's ability to refile these claims after the PA PUC proceeding, *see supra* Section II, we must consider whether such a step was proper. We conclude that it was not.

27

The District Court did not find, and Verizon does not argue, that any of Core's other claims must be presented to the PA PUC, or that the PA PUC even has the authority to hear them. In addition, no party argues that these claims must be presented together. As such, the District Court's action was tantamount to dismissing viable claims without any justification. *Cf. Ahmed*, 297 F.3d at 207 ("[I]f the plaintiff cannot cure the deficiency, an order dismissing a complaint without prejudice is a final and appealable order."). We conclude that this was an error. Certainly, as Verizon points out, Core's claims are all related, and judicial efficiency would be served by hearing them at the same time. To that end, the District Court is free to consider on remand whether or not a stay would be appropriate here. But given the record before us, we conclude that the District Court erred by dismissing Core's claims other than its action for breach of the interconnection agreement.

## IV.

"It would be gross understatement to say that the [Telecommunications] Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999). Nevertheless, we are charged with piecing together what Congress and the FCC have given us. Until we have more guidance on the matter, the most sensible harmonization of the Act's structure and the FCC's declarations is a solution under which the bodies that are responsible for overseeing the formation of interconnection agreements are given the first crack at interpreting and enforcing them. The imperfections of this procedure are not lost on us, but it appears

28

to be the solution most faithful to the FCC's gap-filling authority and the Act's assignment to the state commissions of responsibilities related to interconnection agreements. Accordingly, we will affirm the judgment of the District Court dismissing Count III of Core's complaint without prejudice, vacate the dismissal of the remaining counts, and remand for further proceedings consistent with this opinion.